[Crim. No. 3978.   Second Dist., Div. Three.   June 5, 1946.]

In re EMANUEL J. ORTIZ, a Minor.

S. C. Stoner for Appellant.

Robert W. Kenny, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

DESMOND, P. J.—Emanuel Joe Ortiz, after a hearing in the Juvenile Court of Los Angeles County, was declared a ward of that court under subdivision (m), section 700 of the Juvenile Court Law and committed to the Youth Authority of the State of California. He appeals claiming that the judgment of the court was contrary to the law and to the evidence submitted to the trial court.

Subdivision (m) of section 700 provides that the jurisdiction of the juvenile court extends to any person under the age of 21 years "who violates any law of this State or any ordinance of any town, city, or county, of this State defining crime."

The petition upon which this young man was brought before the juvenile court was filed by a deputy sheriff alleging, in paragraph I, that Ortiz was "a person defined in subdivision M of Section 700" and that he "was *17* years of age on the *17th* day of *March, 1945*," and, in paragraph III, that on or about the 19th day of June, 1945, he committed the crime of robbery by taking from a corporal of the United States Marine Corps $3.00 in cash, the robbery "being accomplished by means of force and fear through the use of a revolver, in violation of Section 211 of the Penal Code."

It appears from the record that this defendant on the night of June 19, 1945, was in the company of four other youths, three of them minors and one, Besserra, past the age of 21 years. The other minors are named Garcia, Bermudez and Ledesma. The five boys congregated at a grocery store and started to ride around in the neighborhood where they resided, Besserra driving the automobile in which they traveled. They finally parked on a blind street and in a little while noticed another automobile drive onto that street not far from the

river where occasionally they went swimming at night. They saw the lights turned off on that car and one of the boys, according to this defendant's testimony, suggested that they go down to the car to see what was going on. Bermudez testified that before they approached the other car they moved their car to another point estimated at two or three blocks away. Another of the boys, Garcia, testified that he heard somebody say, "Let us go see if we can get some money from this fellow." They then walked back to the other car, Besserra, Garcia and Ledesma in the lead. Garcia at that time was carrying a club and the trio just mentioned approached the car from the left-hand side, the other two, Bermudez and this appellant approached from the right-hand side. They found the car occupied by a marine and a young woman acquaintance of his.

The marine testified that as he sat in the dark, in the back seat of the automobile, the door opened and Besserra "stuck a .45 in my face," saying, "This is a holdup." He further testified that Garcia told him to "Stand up; come on out"; that Garcia searched him, "went through my pockets. I had my blouse laying over the back seat of the car. He went through that. Took what was in that. Then he ordered me out of the car. . . . He had a club, and then I think he threw it down later and ordered me out of the car. After I got out of the car he, Besserra, took me about sixteen paces behind the car. Held me there at gun point, while Garcia went in the car." The marine was asked, "Did they take anything from you?," and answered, "Yes, sir, they took my liberty card and I. D. card, cigarette ration card and two or three packs of cigarettes I had on me. I don't know just how many. I had approximately two or three dollars in my pocket." He stated that there were at least five boys in the party, two or three on the right-hand side of the car who opened the car door. He identified Ortiz as one of the boys who was on the right-hand side. Under cross-examination he stated that when they opened the door on the right side they leaned in the car and went through his pockets, "there were hands going everywhere."

According to Garcia, Besserra "opened up the door and we put the gun in the seat. Then said to this marine, 'This is a holdup.'"

Appellant denied that he had heard any statement concerning the getting of money by any of the boys prior to their approach to the car and denied that he knew that Besserra

had a gun before they got to the car, but admitted that he had seen the gun in Besserra's hand when Besserra was at the open left-hand door. He also denied that he opened the door on the right-hand side of the car or that he took any money or cigarettes. It does not appear, however, that he withdrew from the scene of operations or that he made any effort to persuade his companions to desist from the robbery. Although he stated that he did not hear any comment on the subject of money, the court, in view of Garcia's testimony, could conclude that Ortiz heard the same conversation and, further, would have been justified in believing that appellant saw the club in Garcia's hands as the boys approached the car and, therefore, knew that an act of violence was contemplated.

Contrary to the claim of counsel that Ortiz violated no law but merely went over to the car to see what was going on or as part of a boyish prank, we believe that the foregoing résumé is sufficient to sustain the judgment of the trial court that the allegations of paragraph III, charging robbery, were sustained. Penal Code, section 31, provides that ''All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . are principals in any crime so committed.'' (*People* v. *Wilson* (1920), 93 Cal.App. 632, 636 [269 P. 951].)

The appellant claims, however, that the court erred in three particulars relating to his commitment to the California Youth Authority: Namely, (a) ordering the commitment without making a finding as to his age; (b) ordering it without making a finding of the facts upon which it exercised its jurisdiction over him as a ward of the juvenile court; (c) ordering it without making a finding that his welfare required his being taken from the custody of his parents. We are not cited to any statute, nor do we find any, which requires findings upon these matters to be in writing or signed by the trial judge. The case, *In re Brodie* (1917), 33 Cal.App. 751 [166 P. 605], upon which appellant relies, turned upon the provisions of section 9b of the Juvenile Court Act, which are in all respects the same as now appear in section 739, Welfare and Institutions Code, hereinafter set forth. The court, in the Brodie case said (p. 753): ''Section 9b of the act provides as follows: 'No ward of the juvenile court as defined in this act shall be taken from the custody of his parent or legal

guardian, without the consent of such parent or guardian . . . unless the court shall find that the welfare of said person requires that his custody be taken from said parent or guardian.' It will be noted by the provisions of this section that where the parent or guardian of a minor is deprived of his or her custody, certain findings must be made by the juvenile court. . . . As we view the provisions of the act, it is essential that the court make such findings as are required by section 9b and in writing," etc. The opinion discloses that "The complete record of the testimony heard, together with the various orders and findings of the court, are brought up under the alternative method of appeal." Another case upon which the appellant relies, *In re Pierce* (1932), 127 Cal.App. 773 [16 P.2d 765], quotes from *In re Brodie, supra,* the following: " '[I]t is essential that the court make such findings as are required by section 9b and in writing.' " For lack of such a finding that the minor's welfare required that his custody be taken from his parents a reversal was entered and the matter remanded to the juvenile court for appropriate action. The opinion in the latter case, however, states that "It appears that no phonographic reporter was present at the hearing, hence no transcript of the proceedings could be prepared." From this it is clear that there was no material available on the appeal from which the finding of the necessity of taking the custody of the child from his parents might be derived. In this, it differs very materially from the Brodie case and also from the present case, *In re Ortiz,* because in both those cases a hearing was held and a complete record was available. We are not satisfied, however, that the court ruled correctly in the Brodie case when it decided that the required finding must be in writing. On this point we take the view advanced by the People that "the rule . . . is dictum, as nowhere does it appear there that any findings, either oral or written, were made." We feel that the minute order entered in the instant case is a sufficient compliance with the statutory requirements as to findings questioned by specifications (a) and (b) above. The allegations of the petition, recited at the opening of this opinion, definitely stated that this boy was 17 years of age on March 17, 1945, and in paragraph III charged that he committed robbery on the 19th day of June, 1945. They also stated, as we have indicated, that the appellant was "a person defined in Subdivision (*M*) of section 700 [Welfare and Institutions Code]." The minute order to which we have re-

ferred contained the statement that the "Allegations of petition as to Paragraphs I and II [relating to crimes other than robbery] are not sustained; as to Paragraph III, are true." (*Cf. In re Gutierrez* (1920), 46 Cal.App. 94, 95 [188 P. 1004].) Then followed the statement "Minor is declared a ward of the Juvenile Court under Subdivision (M), Section 700 of the Juvenile Court Law."

■ We are satisfied also that a sufficient finding was made during the proceedings and prior to commitment, as hereinafter quoted from the transcript, to justify the order of the court that the appellant be taken from the custody of his parents. Section 739 of the Juvenile Court Law (now part of the Welfare and Institutions Code) states that "no ward of the juvenile court shall be taken from the cutody of his parent or legal guardian without the consent of the parent or guardian, unless the court finds one of the following facts: (a) That the parent or guardian is incapable of providing or has failed or neglected to provide proper maintenance, training, and education for the person. (b) That the person has been tried on probation in such custody and has failed to reform. (c) That the person has been convicted of crime by a jury. (d) That the welfare of the person requires that his custody be taken from his parent or guardian." At the hearing a probation officer reported upon the conduct and character of appellant and it appeared conclusively that he had never been on probation previously; neither had he been convicted of a crime by a jury; nor was there any evidence that his parents were incapable of providing for his proper maintenance, training and education or that they had failed or neglected to provide for the same. Therefore, the question which the court was called upon to determine was whether, under subsection (d) above, the welfare of the boy required that his custody be taken from his parents. They were both in court and his mother testified that she had never had any trouble with him previously; that he stayed home and minded her; that he was industrious and turned over all his earnings to the family. Counsel for appellant suggested to the court that the boy might be returned to his parents for a year to keep him outside the State of California. The court asked the probation officer what he found with reference to the home life of appellant and, in reply thereto, the officer made the following statement: "I think Ortiz comes from a very good family. The family has small means. No money, but

are doing a good deal. That is more than you can say for a lot of people these days. The family say that if we will give the boy a chance, give them a chance, they will take the boy out of the state for a year or two. They work half the year in agricultural fields in Montana and other states. A half a year in Los Angeles. But they agree to stay out of the state, even though they bought their home in El Monte, if we let him go out. The department's recommendation is for C. Y. A. [California Youth Authority]. I think he is a good boy." He stated that the parents of Ortiz had discussed with him the proposal to take the boy to Montana where they expected to work for the Great Western Sugar Company and the court, noting the reference to the probation department and its recommendation for commitment to the California Youth Authority for Ortiz, asked the officer what he thought of the proposal to take him to Montana. He answered: "I think we have to take into consideration the effect of acts like this on the public in general. Especially upon the other Mexican boys. If they see a Mexican boy getting by with things like this, it sets a bad precedent." Later, in commenting on the facts in the case, the court stated, "It is perfectly apparent to me that they [the boys] could not help but know there was going to be a stick up, robbery or holdup, or at least blackmail to be used to obtain some money. . . . I don't think these boys will benefit by having that kind of conduct excused," saying "I feel it is necessary for the Court to make a statement at this time. I agree with counsel for these boys that perhaps the surprising thing to me about these boys is that they have been going on those 16 or 17 years without having gotten into difficulties. As the Father indicates, they are in an area without recreational facilities. Society is to blame for that and not these boys. Therefore, there isn't any question in the Court's mind that these kids, as one of counsel has said, are worth saving. But the Court considers further and feels that that same statement could be made about 99 percent of the boys that are in this Court, or we would not be here as a court. That does not lessen the obligation of society, however, to aid these boys if they can be aided in the development of better conduct and habits which will not get them into more serious difficulty just after they pass their 18th birthday, because then they would be tried in the adult court for the very same things for which they are brought into the Juvenile Court for allegedly committing. . . ." The court then stated

certain facts concerning the crimes charged against the boys, and continued: ''In view of that fact—to make my finding— as far as Ortiz is concerned, as to the allegations of Paragraphs 1 and 2,—I find there is not sufficient evidence. Therefore, those paragraphs will not be sustained. But as to Paragraph 3, I find the allegations there sustained and therefore declare him to be a ward of this Court under Subdivision M, Section 700, of the Welfare and Institution Code.'' The trial judge stated further that ''I should like very much to give first consideration, Mr. Stoner, to the portions of the proposition which you and Mr. and Mrs. Ortiz have submitted. I feel I cannot do so, however, without being troubled in my own mind that I may have discriminated in favor of one of these boys and not the others, because that boy may have parents who could take him out of the state. Personally, it has never been my disposition to believe that we solve any criminal problem by letting boys go out of the state. I think we have here the machinery to take care of our own boys. Perhaps better machinery than they have in some other jurisdictions.'' The court stated at another point that he asked for a recommendation from the probation department, but regardless of that he felt that he had the right, if he chose, to make a different placement where ''the ends of justice and the protection of these boys as well as the protection of society, could better be served. . . .'' He did not, however, find that a placement other than that recommended by the probation department was preferable. Instead, he followed the recommendation and ordered all four boys committed to the California Youth Authority, saying, ''I have taken what I believe to be the best course . . . as far as my own conscience is concerned and my own feeling in the matter.'' From the various statements which we have quoted, it is clear, as the People claim, ''that the court found as a fact that the welfare of these boys required that they be taken from the custody of their parents, in order that they receive training in better conduct and habits, which would not be afforded them in the environment in which they had been living, in order to avoid future trouble, and in the case of the appellant, also because his parents were going out of the state and the court believed that the machinery for taking care of minors was better in this jurisdiction than it would be in another.''

The judgment is affirmed.

Shinn, J., and Wood, J., concurred.